UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE M. JACKSON,
an individual,

                                      Case No. 1:25-cv-636

and

WILLIAM "CASEY" FARMER,                Hon.
an individual,

      Plaintiffs,

v.

MARKET GRID, LLC,
a Michigan limited liability company,

and

THE ESTATE OF JAMES MATTHEWS,

and

MATTHEWS HOLDINGS, LLC,
a Michigan limited liability company,

and

RYAN MONTGOMERY,
an individual,

            Defendants.

Thomas V. Hubbard (P60575)
Elliot J. Gruszka (P77117)
Drew, Cooper & Anding, P.C.
Attorneys for Plaintiff
80 Ottawa Avenue, N.W., Ste. 200
Grand Rapids, MI 49503
(616) 454-8300

## <u>VERIFIED COMPLAINT</u>

*There is no other pending or resolved civil action arising out of
the same transaction or occurrence alleged in the complaint.*

Plaintiffs, George M. Jackson and Willam "Casey" Farmer, by and through their attorneys Drew, Cooper & Anding, P.C., alleges as follows:

### JURISDICTION AND VENUE

1.      Plaintiff George M. Jackson is an individual who is a citizen of the State of Alabama.

2.      Plaintiff William "Casey" Farmer is an individual who is a citizen of the State of North Carolina.

3.      Defendant Market Grid, LLC, is a Michigan limited liability company conducting business in Kent County, Michigan.

4.      On information and belief, no member of Defendant Market Grid, LLC, is a citizen of the States of Alabama or North Carolina.

5.      Defendant Estate of James Matthews's decedent, James Matthews was an individual who upon information and belief was a citizen of the State of Michigan.

6.      Defendant Matthews Holdings, LLC, is a Michigan limited liability company conducting business in Kent County, Michigan.

7.      On information and belief, no member of Defendant Matthews Holdings, LLC, is a citizen of the States of Alabama or North Carolina.

8.      Defendant Ryan Montgomery is an individual who upon information and belief is a citizen of the State of Michigan.

9.      The dispute arises out of services Defendants promised to provide to Plaintiffs subject to written contracts and fraudulent actions taken by Defendants in Kent County, Michigan.

10.      The amount in controversy exceeds $75,000, exclusive of attorney fees, interests, and costs.

11.     Accordingly, jurisdiction and venue are proper with this court pursuant to 28 U.S.C. §§ 1332 and 1391.

## **GENERAL ALLEGATIONS**

12.     Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

13.     Plaintiff George Michael Jackson ("Michael") is an individual residing in the State of Alabama.

14.     Plaintiff William "Casey" Farmer ("Casey") is a longtime friend and sometime business associate of Michael.

15.     Non-party Wesley Jackson ("Wesley") is Michael's father and a sometime investor in Michael's business ventures.

16.     My Path was conceived as a mobile application ("app") and Internet website portal ("web app") that would provide subject-matter tutoring and career guidance to school-aged users.

17.     Michael approached Wesley about investing in the My Path project, and Wesley agreed to act as a silent partner.

18.     After conducting a search for vendors, Casey suggested that he and Michael speak with representatives of Defendant Market Grid, LLC ("Market Grid").

19.     In late 2022 and early 2023, Michael, Casey, and representatives of Market Grid, including James Matthews ("James") discussed Michael and Casey's needs and Market Grid's capabilities in meeting those needs.

20.     In January 2023, Michael and Casey, and James, on behalf of Market Grid, signed a contract whereby Market Grid agreed to provide certain services, including but not limited to:

      a.     Planning and market research;

      b.     Branding;

      c.     Website and Mobile Application Design, Development, and validation for iOS and Android;

      d.     Technology stack initialization; and

      e.     Testing. (**Exhibit A**, My Path Contract.)

21.     Market Grid estimated that the project would take between four to six months to complete. (*Id*.)

22.     In exchange for these services and work product—a functioning mobile app and website—Michael and Casey agreed to pay a total of $54,000.

23.     Neither Michael, Casey, nor Wesley have any background in computer programming or web development.

24.     On information and belief, Market Grid and James had actual or constructive knowledge that Michael, Casey, and Wesley did not have any background in computer programming or web development.

25.     Throughout the spring of 2023, Market Grid communicated with Casey and Michael about ongoing progress on their project, including alleged development of a "pitch deck" for use in presenting the app and web app to school systems and parents. (**Exhibit B**, Final Pitch Deck.)

26.     The parties had a status call in June 2023. The project was not yet close to being finished, despite a financial investment by Michael of $20,000 by that point.

27.     James and Michael continued to discuss the project throughout the summer and fall of 2023.

28.     James represented to Michael that progress was being made on the app development.

29.     James continually requested that Michael send more money to complete the project.

30.     But, on information and belief, no substantive work was being done to complete the My Path app.

31.     During these discussions, Michael inquired about developing another app, dubbed XOXO, that would offer dating services to sports fans.

32.     Michael and James decided to prioritize the development of the XOXO app in order to apply its revenue to the development of the My Path app.

33.     In October 2023, Michael and James signed another contract with Market Grid for the development of a mobile app called XOXO that would combine sports and dating features. (**Exhibit C**, XOXO Contract.)

34.     The XOXO Contract provided for substantially the same services as the My Path Contract, but with a "bundled" reduced price of $35,000.

35.     This project had an 8-to-12-month timeline.

36.     After Casey stopped taking an active role in the project in or about December 2023, Wesley began taking a more active role, investing significant personal funds into the project and communicating directly with James.

37.     Wesley informed James in January 2024 there would be no more payments made until there was a working version of the apps.

38.     With the original due date of the My Path Contract long past, James promised Wesley that a working version of the app and web app would be ready by April 15, 2024.

39.     Between December 2023 and April 2024, James sent numerous electronic communications to Michael and Wesley purporting to show videos of functional versions of the My Path and XOXO apps.

40.     During this time period, James represented to Michael and Wesley that he had as many as 15 people working on the apps.

41.     On information and belief, this representation was false.

42.     James also gave Michael and Wesley access to a website that Market Grid purported to have developed for My Path.

43.     On information and belief, none of these demonstrations were the legitimate work product of Market Grid.

44.     Instead, the demonstrations were "templates" of websites and mobile apps onto which the My Path and XOXO "branding" had been hastily applied.

45.     Encouraged by the supposed progress made to date and the promises of a quick sprint to the finish line, Michael and Wesley began attempting to market the app and web app—christened My Path—to school districts.

46.     They received significant interest in the product, including:

   a.     A potential purchase by the State of Alabama of $3 million in licenses to use My Path, provided it could be deployed by September 2024.

   b.     A commitment from the director of the National Rural Education Association to run a pilot program of My Path with over 100,000 students.

47.     According to James's communications, by March 2024, the My Path app was nearly complete, needing only payment methods from Michael and Wesley for "licenses" for required "backend" accounts to make the app functional.

48.     When April 15, 2024, came, however, Market Grid failed to deliver any viable work product.

49.     By that time, Michael and Wesley had paid more than $80,000 in fees, as follows:

    a.    For My Path:

        i.    $4,000 by wire transfer, in or about March 2023.

        ii.    $6,000 by wire transfer, in or about May 2023.

        iii.    $22,000 by wire transfer in or about June 2023.

        iv.    $10,000 by check in or about December 2023;

        v.    $10,000 by check in or about January 2024; and

    b.    For XOXO:

        i.    $17,500 by wire transfer in or about November 2023;

        ii.    $5,000 by bank transfer in or about January 2024; and

        iii.    $12,500 by wire transfer in or about January 2024.

50.    These payments were not, however, made directly to Market Grid.

51.    Instead, at James's direction, payments were made to him, either personally or "Matthews Holdings, LLC"—a separate entity.

52.    In May 2024, James demanded even more money to buy additional licenses for the apps.

53.    Shortly thereafter, James took his own life.

54.    Michael and Wesley began communicating with Market Grid through Defendant Ryan Montgomery ("Ryan").

55.    Ryan is also a member of Market Grid.

56.    When Michael and Wesley inquired about the status of their projects, Ryan claimed he could find nothing in Market Grid's files about My Path or XOXO.

57.    Michael and Wesley demanded either working versions of the apps they had paid for and Market Grid had agreed to build, or a return of their money.

58.     When Michael and Wesley explained the scope of the projects Market Grid had agreed to undertake, Ryan claimed that such apps would cost $1,000,000 to design and implement from scratch, not $50,000.

59.     Ryan confirmed Michael and Wesley's suspicions that the demonstration apps they had been shown were copied from other apps, not the work product for which they had paid.

60.     To date, Market Grid has not supplied either working versions of the apps or a refund.

61.     Market Grid's website is false, dishonest, and misleading.

62.     In a now deleted version of the website that was active when Michael and Wesley were working with Market Grid, which Plaintiffs obtained through the Internet Archive, the "About Us" section lists approximately a dozen employees.

63.     On information and belief, none of these individuals are or ever were employees of Market Grid.

64.     On information and belief, the headshots that originally appeared on the Market Grid website of its employees are headshots of models. (**Exhibit D**, June 2024 Market Grid About Us.)

65.     At least one other company in the same field as Market Grid has an identical list of employees with substantially the same names and headshots. (**Exhibit E**, Pelican About Us.)

66.     A version of Market Grid's website, active when Michael and Wesley were considering working with Market Grid, lists testimonials that it represents came from actual customers. (**Exhibit F**, 2022 Testimonials Screenshot.)

67.     Many of these same testimonials appear verbatim on another company's website and are attributed to the same clients. (**Exhibit G**, Design Pickle Testimonials.)

68.    Versions of the website from the same time period claim that Market Grid has more than "500 team members and growing" and "800+ customers"). (**Exhibit H**, Claims of Team Size and Customer Base.)

69.    Versions of Market Grid's website, active when Michael and Wesley were considering working with Market Grid, offer the following services:

   a.    Branding;

   b.    Marketing;

   c.    Web development; and

   d.    Graphic Design. (**Ex. F.**)

70.    The services described in Paragraph 70 are marketed to those "just starting" their business. (*Id.*)

71.    The services described in Paragraph 70 are subject to a "Satisfaction Guarantee" promising that consumers can "Try Marketing Essentials risk-free." (*Id.*)

72.    On information and belief, this and similar content on Market Grid's website was presented to the public for the purpose of deceiving innocent consumers into believing:

   a.    Market Grid was a larger and more experienced enterprise than it actually was;

   b.    Market Grid had numerous employees that it did not in fact employ; and

   c.    Market Grid had completed satisfactory work for other specific consumers where it had not done so.

73.    Market Grid was used as a mere instrumentality of its members.

74.    The corporate form of Market Grid was knowingly used by Market Grid's members to perpetrate fraud.

75.    The corporate form of Market Grid was knowingly used by its members to perpetrate dishonest and unjust acts.

76.    Market Grid and its members did not respect the corporate form.

77.    As alleged herein, Market Grid's members, including Defendants, used Market Grid for purposes of perpetrating wrongs on, among others, Plaintiffs.

## COUNT I:  BREACH OF CONTRACT

78.    Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

79.    Plaintiff George Michael Jackson is an adult individual competent to contract.

80.    Plaintiff William "Casey" Farmer is an adult individual competent to contract.

81.    Defendant Market Grid, LLC is a Michigan limited liability company capable of entering into enforceable contracts.

82.    On information and belief, Defendant Estate of James Matthews's decedent James Matthews was a member of Market Grid and authorized to enter into contracts on its behalf.

83.    On or about January 10, 2023, Michael, Casey, and Market Grid entered into a contract under which Market Grid was obligated to provide certain software development services and Michael and Casey were obligated to pay. (**Exhibit A**.)

84.    On or about November 22, 2023, Michael and Market Grid entered into a contract under which Market Grid was obligated to provide certain software development services and Michael was obligated to pay. (**Exhibit C**.)

85.    These mutual promises were adequate consideration to support each contract.

86.    Michael and Casey fulfilled their obligations under the contracts by paying the amounts due thereunder.

87.     Market Grid breached its obligations under the contracts, including but not limited to its obligation to deliver the software development services.

88.     In the summer of 2024, Market Grid repudiated its obligations under the contracts.

89.     As a direct result of Market Grid's breaches, Michael and Casey have suffered damages including, but not limited to:

    a.     Loss of the amounts paid under the contracts; and

    b.     Loss of considerable profit opportunity from potential customers who were interested in his software products.

90.     Furthermore, this loss was unjust and resulted from the manner in which the individual members of Market Grid and Matthews Holdings operated these entities.

## COUNT II: COMMON-LAW FRAUD

91.     Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

92.     As alleged above, Defendants made the following material representations:

    a.     (Made by Defendant Market Grid and Defendant Matthews)—That the two mobile and web applications described herein could be developed, with attendant services as described in the contracts (**Exhs. A and C**), for approximately $50,000 each;

    b.     (Made by all Defendants)—That the size and experience of Market Grid's workforce was sufficient to satisfy Market Grid's obligations under the contracts; and

    c.     (Made by all Defendants)—That Market Grid had a track record of success in its field, as evidenced by testimonials of prior customers on its website.

93.     These representations were false.

94.    Defendants knew these representations were false when they made them or they made them with reckless disregard of their truthfulness.

      a.    On information and belief, Defendants Market Grid and Matthews knew or should have known that they would not be able to develop a fully functional mobile application at the agreed price.

      b.    Defendants had actual knowledge that they did not have a large workforce.

      c.    Defendants had actual knowledge that the testimonials on their website were false.

95.    Defendants intended that Plaintiffs and others like them would rely on these materially false representations.

      a.    On information and belief, Defendants Market Grid and Matthews intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of an unrealistically low price.

      b.    On information and belief, Defendants intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of the false size of Defendant Market Grid.

      c.    On information and belief, Defendants intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of the false positive feedback of fictitious customers of Defendant Market Grid.

96.    Plaintiffs reasonably relied on these representations in choosing to do business with Defendants.

97.    Plaintiffs suffered damages as a result of these representations, including but not limited to loss of the funds paid.

98.    These damages amount to an unjust loss that resulted from the manner in which the individual members of Market Grid and Matthews Holdings operated these entities.

### COUNT III: FRAUD IN THE INDUCEMENT

99.    Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

100.    Defendants Market Grid and Matthews represented to Plaintiffs that two mobile and web applications could be developed, with attendant services as described in the contracts (**Exhs. A and C**), for approximately $50,000 each.

101.    This representation was false when made.

102.    Defendants falsely represented that the size and experience of their workforce was larger and broader than it was by posting fictitious employee pictures on the Market Grid website and by falsely representing that Market Grid had more than 500 team members.

103.    Defendants falsely represented the abilities and output of Market Grid by posting fictitious customer reviews on its website and falsely stating that Market Grid had over 800 customers.

104.    Defendants knew these representations were false when they made them or they made them with reckless disregard of their truthfulness.

    a.    On information and belief, Defendants Market Grid and Matthews knew or should have known that they would not be able to develop a fully functional mobile application at the agreed price.

    b.    Defendants had actual knowledge that they did not have a large workforce.

    c.    Defendants had actual knowledge that they did not have hundreds of customers.

105.    Defendants intended that Plaintiffs would rely on these materially false representations.

       a.     On information and belief, Defendants Market Grid and Matthews intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of an unrealistically low price.

       b.     On information and belief, Defendants intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of the false size of Defendant Market Grid.

       c.     On information and belief, Defendants intended Plaintiffs to base their decision to hire Defendants, in part, on the basis of the false number of customers of Defendant Market Grid.

106.    Plaintiffs did reasonably rely on the false representations when they entered into the contracts.

107.    Plaintiffs have suffered damages as a result of their reasonable reliance on the false representations, including but not limited to loss of the funds paid.

108.    These damages amount to an unjust loss that resulted from the manner in which the individual members of Market Grid and Matthews Holdings operated these entities.

## COUNT IV:  VIOLATION OF MCL § 445.903

109.    Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

110.    Defendants were and are engaged in "trade or commerce" as defined in MCL § 445.902(1)(g), by advertising and offering for sale a "business opportunity" as defined in MCL § 445.902(1)(a).

111.    Defendants represented that their software development and marketing services would be performed by a large, skilled team, when in fact no such team existed, in violation of MCL § 445.903(1)(e).

112.    Defendants Market Grid and Matthews materially misrepresented the cost of the work they agreed to perform for Plaintiffs such that Plaintiffs reasonably believed that the work would cost what Plaintiffs bid, in violation of MCL § 445.903(1)(bb) and (cc).

113.    Defendants materially misrepresented the size and experience of their workforce, such that Plaintiff reasonably believed that Defendants had greater capabilities than they had, in violation of MCL § 445.903(1)(bb) and (cc).

114.    Defendants materially misrepresented the satisfaction of their prior customers, such that Plaintiffs reasonably believed that Defendants were capable of performing the work agreed to do for Plaintiffs, in violation of MCL § 445.903(1)(bb) and (cc).

115.    As a result of these violations, Plaintiffs suffered actual damages in excess of $250.

116.    These damages amount to an unjust loss that resulted from the manner in which the individual members of Market Grid and Matthews Holdings operated these entities.

## COUNT V: UNJUST ENRICHMENT

117.    Plaintiffs incorporate the preceding paragraphs as if fully reinstated herein.

118.    Plaintiffs conferred a benefit on Defendant Matthews Holdings, LLC, in the form of payments for alleged services.

119.    It is inequitable for Defendant Matthews Holdings, LLC, to retain this benefit because Defendant Matthews Holdings, LLC, had no contract with Plaintiffs and furnished no consideration—directly or indirectly—in exchange for the benefit Plaintiffs conferred.

120.    Defendant Estate of James Matthews's decedent James Matthews used Defendant Matthews Holdings, LLC as a mere instrumentality.

121.    Defendant Estate of James Matthews's decedent James Matthews knowingly used the corporate form of Defendant Matthews Holdings, LLC, to perpetrate a wrong.

122.    Defendant Estate of James Matthews's decedent James Matthews and Defendant Matthews Holdings, LLC, did not respect the corporate form.

123.    This Court should restore to Plaintiffs the benefit they conferred on Defendant Matthews Holdings, LLC.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

a.    Enter judgment in their favor and against Defendants in the amounts Plaintiffs prove at trial;

b.    Pierce the corporate veil and hold Market Grid's and Matthews Holdings' members personally liable for using these entities to commit unjust, wrongful and/or fraudulent acts, which resulted in unjust loss to Plaintiffs; and

c.    Award Plaintiffs all other relief allowed under the law or equity including costs and fees where authorized by law, including his reasonable attorneys' fees as authorized by MCL § 445.911.

Respectfully submitted,

Date:  June 9, 2025

/s/Thomas V. Hubbard
Thomas V. Hubbard (P60575)
Elliot J. Gruszka (P77117)
Drew, Cooper & Anding, P.C.
Attorneys for Plaintiff
80 Ottawa Avenue, N.W. Ste. 200

Grand Rapids, MI 49503
(616) 454-8300

## VERIFICATION

    I declare under oath that the factual statements above in this Verified Complaint are true to the best of my information, knowledge, and belief based on my personal knowledge and review of the relevant facts and documents.

_____
George Michael Jackson

Subscribed and sworn
before me this 12ᵗʰ day of _May_ , 2025

_____
Notary Public, Tennessee County, Marion
My commission expires: aug. 9, 2026
Acting in the County of Marion

## VERIFICATION

    I declare under oath that the factual statements above in this Verified Complaint are true to the best of my information, knowledge, and belief based on my personal knowledge and review of the relevant facts and documents.

_____
William "Casey" Farmer

Subscribed and sworn
before me this ___ day of _____, 2025

_____
Notary Public, _____ County, _____
My commission expires: _____
Acting in the County of _____

17

Grand Rapids, MI 49503
(616) 454-8300

### **VERIFICATION**

I declare under oath that the factual statements above in this Verified Complaint are true to the best of my information, knowledge, and belief based on my personal knowledge and review of the relevant facts and documents.

George Michael Jackson

Subscribed and sworn
before me this ___ day of _____, 2025

Notary Public, _____ County, _____
My commission expires: _____
Acting in the County of _____

### **VERIFICATION**

I declare under oath that the factual statements above in this Verified Complaint are true to the best of my information, knowledge, and belief based on my personal knowledge and review of the relevant facts and documents.

William "Casey" Farmer

Subscribed and sworn
before me this 4 day of June, 2025

Notary Public, Iredell County, NC
My commission expires: Dec. 01 2028.
Acting in the County of Iredell.

Melanie Belhumeur
Notary Public
Iredell County
North Carolina
My Commission Expires 12/1/2028

17